IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


LEASHA G. DAVIDSON                                                    PLAINTIFF

v.                                    CIVIL NO. 20-05167

KILOLO KIJAKAZI,[1] Acting Commissioner                        DEFENDANT
Social Security Administration


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATIONS**


Plaintiff, Leasha Davidson, brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of a decision of the Commissioner of the Social Security Administration

(Commissioner) denying her claims for a period of disability and disability insurance benefits

("DIB") under Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§

423(d)(1)(A).  The parties have filed appeal briefs and this case is before the undersigned for

report and recommendation. (ECF Nos. 16, 17).  In this judicial review, the Court must

determine whether there is substantial evidence in the administrative record to support the

Commissioner's decision.  42 U.S.C. § 405(g). The Court has reviewed the entire transcript

along with the complete set of facts and arguments presented in the parties' briefs, which are

repeated here only to the extent necessary.

---

[1] Kilolo Kijakazi has been appointed to serve as the Acting Commissioner of Social Security,
and is substituted as Defendant, pursuant to Rule 25(d)(1) of the Federal Rules of Civil
Procedure.

## I.     Procedural Background:

Plaintiff protectively filed her application for DIB on November 2, 2017, alleging an inability to work since August 30, 2014, due to Crohn's disease, ulcerative colitis, a right shoulder injury, transient ischemic attack, traumatic brain injury, depression, anxiety, PTSD, and bilateral wrist injury. (Tr. 11, 214–15). An administrative hearing was held on June 26, 2019, at which Plaintiff appeared with counsel and testified. (Tr. 35–84). Plaintiff amended her onset date to November 9, 2016, during this hearing. (Tr. 51).

On November 8, 2019, the ALJ issued an unfavorable decision. (Tr. 11–27).  The ALJ found that during the relevant period, Plaintiff had an impairment or combination of impairments that were severe: somatization disorder, possible Munchausen syndrome, severe cluster B personality disorder, obesity, moderate degenerative joint disease of the left shoulder, bilateral carpal tunnel syndrome with release on both, anxiety, and history of transient ischemic attack. (Tr. 14).  However, after reviewing all evidence presented, the ALJ determined that through the date last insured, Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 14–17). The ALJ found Plaintiff retained the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. §§ 404.1567(b) with the following limitations: limited to only semiskilled work and occasional interaction with supervisors, coworkers, and the general public. (Tr. 17–25).

With the help of a Vocational Expert (VE), the ALJ determined that Plaintiff could perform her past relevant work as a data entry clerk, which is a semiskilled sedentary job, and alternatively could perform the requirements of light, unskilled occupations such as cleaner housekeeping, mail clerk, or assembler. (Tr. 25–26). The ALJ found Plaintiff had not been

under a disability, as defined by the Act, from November 9, 2016, through June 30, 2019, the date last insured. (Tr. 26–27).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which was denied on July 9, 2020. (Tr. 1–3). Subsequently, Plaintiff filed this action. (ECF No. 2). The parties have filed appeal briefs and this case is before the undersigned for report and recommendation. (ECF Nos. 18, 19). The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs and are repeated here only to the extent necessary.

## II.    Evidence Presented

As part of its review, the Court has read the Plaintiff's testimony before the ALJ. Plaintiff testified that she was working at Arvest Ballpark when she sustained a rotator cuff injury. (Tr. 51.   Plaintiff previously had been diagnosed with Crohn's disease and was on biologics, but her health declined severely from pain associated with her shoulder injury.  (Tr. 51.  Plaintiff testified that she did work some after her 2013 shoulder surgery but suffered from headaches, had problems lifting products, and was physically unable to do as much as she had previously. (Tr. 51.  She testified she amended her onset date to November 9, 2016, for a series of reasons – she had suffered another transient ischemic attack (TIA) and her entire left side was affected; the biologics she was taking were affecting her bones, including her left knee and left shoulder; and she underwent two additional surgeries. (Tr. 52). Plaintiff testified her first TIA was in 2015, and the last one had been in 2017 where she was treated at Mercy for a few days, and then sent home with Mercy Home Health for physical, occupation, and speech therapy. (Tr. 57-58).  She underwent 6-8 weeks of speech and occupational therapy and reported that while she had continued trouble with her knee and memory, her speech improved.

3

(Tr. 58).  Plaintiff underwent carpal tunnel surgery in May 2017 and had left shoulder surgery at the same time as her left wrist surgery. (Tr. 53). Plaintiff testified that between the scope and the surgery on her left shoulder she was unable to lift anything more than 5-10 pounds; she could not even pick up one of her grandchildren, she could not sleep on the shoulder, and was in a lot of pain. (Tr. 53–54).  At the time of her testimony, Plaintiff was using a cane for her knee and had taken four falls this year. (Tr. 52).  The Court notes Plaintiff was considered for surgery (a total knee replacement) but testified the insurance company first required a round of physical therapy and Plaintiff had fallen again, delaying her participation in physical therapy.   With respect to gastrointestinal problems, Plaintiff testified she suffered from IBS and each time she took antibiotics, she developed a C. diff[2] infection. She was given a fecal transplant at the Freeman Hospital in Joplin with the hopes she could avoid further infections. Plaintiff testified she would have severe diarrhea, excruciating abdominal pain, and dehydration that would require hospitalization for four to six days.  Plaintiff testified she had been hospitalized in 2018 for about six days with Crohn's and shortly after, suffered a fall which required her to start using a cane. (Tr. 61-62).  During the same year, Plaintiff had a mental health hospitalization and started seeing Charla Watkins, DNP, monthly. She testified that she had been very sick with the Crohn's and C. diff; felt like she just lacked any quality of life; and became suicidal. (Tr. 59–60).  Plaintiff testified she still suffered from depression and took medication.  (Tr. 61).

Plaintiff was asked about her daily life from the amended onset date (2016) forward. She described she had to keep her knee elevated and could only go outside using her cane. (Tr.

---

[2] C. diff (also known as Clostridioides difficile or C. difficile) is a germ (bacterium) that causes severe diarrhea and colitis (an inflammation of the colon). *See* https://www.cdc.gov/cdiff/what-is.html (Last accessed on November 8, 2021).

64). She said she was unable to do a lot of cooking and was unable to multitask anymore which was very difficult for her. Plaintiff's hands were hurting less at the time of her testimony, but she reported they were swollen when she woke up in the morning. (Tr. 65). Plaintiff said that she could not have grandchildren over if she was home alone; that her husband, a disabled veteran, cooked, cleaned, and helped change the sheets; and that she could bathe herself only with the help of grab bars to get in and out of the bathtub, and needs assistance getting into and out of vehicles. (Tr. 63-64). Plaintiff could do some basic household activities, cross-stitch, and read, but could not get outside, exercise or color. (Tr. 64).

The Court has also reviewed Plaintiff's medical records which are voluminous. The pertinent parts, while lengthy, are necessary to the Court's decision and are summarized here:

On November 16, 2016, Plaintiff was seen by Allan Weston, MD, who noted Plaintiff has Crohn's Colitis which was being treated by oral Imuran.[3] (tr. 422). Plaintiff had recently finished a three-week course of vancomycin for bronchitis and was now suffering from a C. diff infection. Plaintiff also had IBS and GERD, had frequent diarrhea, and had lost 30 pounds.

On February 21, 2017, Plaintiff was seen by Charla Watkins, DNP, FNP-BC, SANE-A, for counseling. She denied side effects of any medications and reported her depression was better, but her anxiety was still intermittent as she was dealing with Crohn's diagnosis and altered family dynamics. (Tr. 1498). Plaintiff was prescribed hydroxyzine for anxiety, Xanax for depression, and was advised to decrease her dose of Effexor.

---

[3] Imuran is an immunosuppressant that is used to prevent organ rejection in transplants, and is also used to treat rheumatoid arthritis. https://www.webmd.com/drugs/2/drug-13983/imuran-oral/details (Last accessed on November 17, 2021).

On March 7, 2017, William Kendrick, MD, gave an updated referral to Family Health and Counseling for Depression with anxiety. (Tr. 583). Plaintiff saw DNP Watkins for follow-up and medication management, and reported she was tolerating the lower dose of Effexor well with no side effects. (Tr. 1499). Her Effexor and Xanax were refilled.

On March 23, 2017, Plaintiff was seen by Nicholas Gentry, MD, in the Washington Regional Medical Center Emergency Department for abdominal pain with a small amount of bloody diarrhea and vomiting. (Tr. 1891–92).

On March 28, 2017, Plaintiff was seen Dr. Kendrick after a C-diff positive diagnosis on March 23 at Washington Regional Medical Center. (Tr. 579–82). Plaintiff was taking vancomycin but still not feeling well and experiencing nausea, vomiting, diarrhea, and dizziness. Plaintiff's diagnoses were Crohn's disease with other complications, diarrhea, and ulcerative colitis.

On April 17, 2017, Plaintiff was seen by Dr. Weston, a gastroenterologist who noted Plaintiff had suffered three recurrences of C. diff related diarrhea, twice in 2016 and again in March 2017. (Tr. 2731–34). He noted Plaintiff had taken some left over oral vancomycin for a week, but had stopped as she ran out and could not afford the refills. Her last colonoscopy on December 9, 2016 and was normal with normal biopsies. Plaintiff was diagnosed with irritable bowel syndrome with diarrhea and C. diff infection. Dr. Weston noted he was unsure if she was a carrier of C. diff or truly had enterocolitis given that her history of IBS-D was very difficult; Plaintiff has a history of proctosigmoiditis as well. They discussed the idea of a fecal transplant via enteroscopy.

On June 15, 2017, Plaintiff was seen at Watkins Family Health, counseled by Charla Watkins, DNP, for medication management for anxiety and depression, and underwent a blood pressure check. (Tr. 1491). Plaintiff reported having a fecal transplant on April 24, 2017, and undergoing a left shoulder surgery, and left carpal tunnel release. She reported feeling stressed and reported she had tapered off her Effexor and felt better than when she was on it. Plaintiff was prescribed Xanax for depression and instructed to take half of a tablet as needed and to follow-up in two weeks.

On July 27, 2017, Dr. Weston described Plaintiff as having a history of IBS-D and proctosigmoiditis, diverticulosis, and C. diff colitis with complaints of crampy diarrhea, pain and pain following eating. (Tr. 405–09). She was noted to be a frequent flyer to Emergency Departments. Dr. Weston diagnosed Plaintiff with diarrhea and noted a suspicion that the cause was IBS-D not IBD> and planned to get stool study done.

On August 8, 2017, Plaintiff had an X-Ray of her abdomen with one chest view which showed nonspecific nonobstructive bowel gas pattern and no acute cardiopulmonary findings. (Tr. 2041).

On August 15, 2017, Plaintiff was seen by Dr. Kendrick with complaints of flu-like symptoms on-going for 10 days. (Tr. 569–73). Plaintiff asked for a refill of her Dilaudid, reporting she felt like her Crohn's was always flaring up and that she had been dealing with the pain or taking Aleve. She was also feeling anxious and wanted to switch to Xanax because the diazepam made her feel "sleepy and loopy," and she had a hangover affect with it. Plaintiff reported a recent emergency room visit for a breathing treatment. She was unable to take antibiotics for as long as possible due to the fecal transplant and she was 4-months post-

procedure. Plaintiff had inquired whether a steroid shot and reported night fevers as high as 102.8, but it never for more than twenty-four hours. A physical examination revealed slight wheezing. Plaintiff was diagnosed with Crohn's disease, chronic pain, ulcerative colitis, long term use of opiates, an unspecified anxiety disorder, and acute bronchitis. A review of the prescription monitoring program and recent drug test results showed Plaintiff was compliant with therapy. She was advised that Dr. Kendrick couldn't hear any sounds in her lungs, but her pulse rate was elevated.  Plaintiff was given samples of Symbicort and a shot of Kenalog; advised to use breathing treatments up to four times daily as needed; and switched back to Xanax from diazepam.

On September 7, 2017, Plaintiff saw Rex L. Porte, MD, and was assessed with acute bronchitis; allergic rhinitis; Crohn's disease, unspecified with other complication; chronic pain; ulcerative colitis, unspecified; long term use of opiates; and an unspecified anxiety disorder. (Tr. 565–68). Plaintiff's stool culture was negative, and chest X-Rays clear. Plaintiff was advised to start Allegra daily, twice daily if needed. None of the medications for Crohn's disease had worked and she was to make her next appointment with a gastrointestinal doctor.

On October 10, 2017, Plaintiff was seen by Jeffery Tate, PA, in the Emergency Department with periumbilical pain that began two days ago, radiated in her back and was worsening. (Tr. 2053–58). Plaintiff reported nausea but no episodes of vomiting or diarrhea, describing her symptoms like Crohn's flares in the past.  Plaintiff's physical examination revealed elevated blood pressure, as well as guarding and tenderness in her abdomen and her discharge diagnoses were abdominal pain and chronic ulcerative colitis. (Tr. 2065, 2072).

On October 12, 2017, Plaintiff was seen by Jessica Wood, RN, in the Emergency Department. (Tr. 2081). Plaintiff reported diarrhea, abdominal cramping, nausea, and vomiting for the past four days. The character was watery, not bloody. Plaintiff was noted to have been seen multiple times in the ED for the same complaint, and was slated to follow up next week with the GI specialist. Plaintiff's physical exam was normal, except for elevated blood pressure and moderate tenderness in the left upper quadrant of her abdomen. Plaintiff was tolerating food by mouth, her labs were grossly normal, and she declined need for any medications as she had promethazine at home. Nurse Wood planned to treat Plaintiff symptomatically and have her follow up with her PCP. Plaintiff was also given strong return to ED warning.

On October 18, 2017, Plaintiff's history was reviewed by Dr. Weston. (Tr. 402–405). Plaintiff's reviewed problems were: C. diff colitis, atypical mycobacterial infection of lung, malignant tumor of cervix, malignant tumor of ovary, hyperlipidemia, body fluid retention, essential hypertension, acute tracheobronchitis, allergic rhinitis, Crohn's disease, inflammatory bowel disease, irritable bowel syndrome, proctitis, steatosis of liver, chronic arthritis, derangement of knee, chondromalacia of patella, knee joint effusion, rotator cuff syndrome, disorder of rotator cuff, impingement syndrome of shoulder syndrome on the right, mallet finger on the left, fever beginning on May 2, 2017, diarrhea, chronic diarrhea of unknown origin beginning on June 12, 2017, abdominal pain, chronic abdominal pain, sprain of the right hand, history of infectious disease beginning on October 11, 2014. Plaintiff's reported symptom was frequent diarrhea, and it was recommended she use Pepto-Bismol as needed for IBS-D, to continue loperamide[4] (with increased dose) and follow the BRAT diet.

---

[4] Loperamide (brand name Imodium) is used to treat sudden diarrhea and works by slowing the movement of the gut. It is also used to treat ongoing diarrhea in people with

Plaintiff's diagnoses were irritable bowel syndrome with diarrhea, diverticular disease of colon, and nonspecific ulcerative proctitis. (Tr. 405).

On November 26, 2017, Plaintiff was seen in the Emergency Department with diarrhea and vomiting that began two days prior and pain in her upper abdomen. (Tr. 1936). Plaintiff reported a history of inflammatory bowel disease and had some diarrhea for two days, which she had often, but had a lot since yesterday afternoon and vomited three times during the night. She reported pain in the lower left quadrant, where her ulcerative colitis usually hurt, and in the epigastrium. She was taking Asacol[5] and Dilaudid as needed for abdominal pain. Plaintiff was given intramuscular medication and Gatorade — some of which she was able to keep down but some of which she threw up. She had Phenergan at home and would rest up and sip clear liquids. Stool testing was ordered, but Dr. Robert Irwin opined that with a normal white blood cell count it was unlikely this was C. diff.

On November 28, 2017, Plaintiff presented to WRMC's Emergency Department with diffuse abdominal pain and diarrhea that started three days prior. (Tr. 1931–32). She was noted to have been in recently, but had ongoing symptoms and was told to come back for IV fluids. (Tr. 1931). A physical examination revealed mild, diffuse abdominal tenderness with no distension or rebound. (Tr. 1932). Plaintiff was given IV fluids and nausea medications in the ER prior to discharge. Tony Mitchell, RN, noted Plaintiff had been in multiple times for the same complaints; that evaluations in the ER and inpatient did not show findings consistent

---

inflammatory bowel disease. https://www.webmd.com/drugs/2/drug-4789-4025/loperamide-oral/loperamide-oral/details  (Last accessed November 17, 2021).

[5] Asacol (generic name mesalamine) is used to reduce symptoms of ulcerative colitis and works by decreasing swelling in the colon. *See* https://www.webmd.com/drugs/2/drug-9006/asacol-oral/details  (Last accessed on November 17, 2021).

with Crohn's or ulcerative colitis; and that there had been previous mention that she may not have an irritable bowel disease. Records from her GI physician were obtained and her most recent colonoscopy and biopsies were normal. RN Mitchell opined she did not believe Plaintiff had an irritable bowel disease including Crohn's or ulcerative colitis.

On December 1, 2017, Plaintiff was seen by Jess Daniel, MD, in the WRMC Emergency Department and reported she had begun vomiting bright red blood this evening, which then progressed to dark red blood after 6 days of nausea, vomiting, diarrhea, and cramping abdominal pain. (Tr. 1976). As this was her third visit in a week with unrelenting symptoms, Dr. Daniel discussed her case with their hospitalist, Dr. Robinson. (Tr. 1977). Dr. Daniel ordered an abdominal CT scan and started Plaintiff on Protonix.

On the same day, Derinda Trobaugh, MD, reviewed Plaintiff's case and made the following plan: admit to inpatient; nothing by mouth but medications; administer IV fluids; antiemetics and pain medications as needed; consult with Dr. Moore with GI; and continue Asacol and Canasa suppositories. (Tr. 1982–85). Plaintiff underwent a CT scan of her abdomen and pelvis with contrast which showed no acute inflammatory process within the abdomen or pelvis; punctate non-obstructing left renal calculus; and mild diverticulosis of the colon. (Tr. 1994).

A discharge summary for Plaintiff's hospital stay from December 1-3, 2017, was prepared by Dr. Trobaugh. (Tr. 1985–87). Plaintiff's primary diagnoses at discharge were post-cholecystectomy diarrhea predominant irritable bowel syndrome with question of Crohn disease; hemorrhoidal bleeding; and hematemesis likely due to recurrent vomiting. Her secondary diagnoses were nausea and vomiting, abdominal pain, obesity, hypertension, and

chronic pain syndrome. Plaintiff had undergone an EGD and Colonoscopy at WRMC and was instructed to follow up with Dr. Kendrick within 1-2 weeks and Dr. Weston within 1 month. Lab results were unremarkable except for her blood potassium level. During her hospital stay, was no record of biopsy-proven Crohn disease. Her EGD was normal, and her colonoscopy was normal to ileum, mild diverticulosis, and internal hemorrhoids. Plaintiff's symptoms were thought likely secondary to post cholecystectomy syndrome as well as diarrhea predominant IBS, and her physicians believed her hematemesis was secondary to recurrent vomiting and her hematochezia was due to benign hemorrhoids. She was started on bile acid sequestrants and a lactose and gluten free diet. Biopsy results were pending at time of her discharge. By day 3, she was feeling much improved; had no further vomiting and few episodes of diarrhea; was able tolerate a regular gluten free and lactose free diet; and was discharged home.

On December 2, 2017, Plaintiff underwent an EGD and colonoscopy which showed mild diverticulosis of the left colon and internal hemorrhoids. (Tr. 2716–17). John Moore, MD, opined hematemesis was likely due to vomiting, which was possibly due to opioid side effects and Plaintiff's hematochezia was likely due to benign hemorrhoids. He also diagnosed post-cholecystectomy diarrhea, and diarrhea predominant IBS. Plaintiff was prescribed colestipol and dicyclomine. She was advised to minimize opiates, try a low FODMAP diet, take proton pump inhibitors as needed for reflux symptoms, and consider stopping Asacol and Canasa as Dr. Moore had never seen any pathologic evidence for inflammatory bowel disease (IBD).

On December 14, 2017, Plaintiff had a follow-up visit after her hospital stay at Washington Regional. (Tr. 550). She was still having diarrhea and was prescribed colestipol. Plaintiff's EGD was normal, and her colonoscopy was within normal limits up to the ilium but

reflected mild diverticulosis and internal hemorrhoids. Hematemesis was thought to be from continuous vomiting caused by cholecystectomy syndrome, while the hematochezia was thought to be from internal hemorrhoids. A physical exam revealed tenderness to her left lower quadrant, fluid behind the tympanic membrane of her ear, postnasal drip, and boggy mucosa in her nose. (Tr. 551–53). Psychiatric examination revealed intact and appropriate insight/judgment, intact memory, normal mood, and full affect, with intact orientation to time person, and place. Plaintiff's assessments were abdominal pain, nausea with vomiting, diarrhea, rectal bleeding or hematochezia, hematemesis, diverticulosis of colon without diverticulitis, malabsorption syndrome, allergic rhinitis, bilateral otalgia, postnasal drip, and an anxiety disorder. (Tr. 553–54).

On January 23, 2018, Plaintiff was seen again at the emergency room with vomiting, diarrhea, and left sided abdominal pain which had begun three days prior and was steadily worsening. (Tr. 2109–2115). She reported a fever over the weekend, but that it had broken. Her history included Chrohn's disease and C. diff, noting Plaintiff had not used any antibiotics except for a Z-Pac 2 months prior for a respiratory illness. Plaintiff reported to Alyssa Snow, PA, that she used Dilaudid every four hours or as needed for abdominal pain, and she had taken the past night. Plaintiff had bowel movements while at the ED, though not frequent diarrhea as described, and stool cultures were acquired. Plaintiff's diagnoses at discharge were diarrhea and abdominal pain. Plaintiff had a CT scan of her abdomen on this date which showed mild sigmoid diverticulosis, mild diffuse fatty infiltration of the liver, and status post cholecystectomy.  (Tr. 2132–33).

On March 2, 2018, Plaintiff was seen by Peter Ball, MD, in the emergency department with both physical and psychological complaints. (Tr. 1407). Dr. Ball noted he spoke with Dr.

Moore at a previous ER admission who reported Plaintiff did not evidence Crohn's disease but who planned to set her up for a capsule endoscopy. Plaintiff reported severe abdominal pain, blood in her stool, and vomiting with streaky blood in it. She said she was feeling depressed and had been having suicidal thoughts over the past few days, noting her husband had been gambling and lying to her about it which increased the stress in her life.

Plaintiff was ultimately admitted to the inpatient psychiatric unit on March 2, 2018, where she stayed until discharge on March 6, 2018. (Tr. 1432, 1442–48). Julia L. Horton-Bertrand, MD, interacted with Plaintiff while she was sitting in the dining area of the Behavioral Health Unit, talking with other patients. (Tr. 1440). Plaintiff reported her diarrhea was "getting there" and denied nausea/vomiting or abdominal pain this morning. Dr. Horton-Bertrand noted Plaintiff had been admitted to WRMC in December 2017 and seen by gastroenterology where an EGD and colonoscopy were both benign with no evidence of Crohn's disease or ulcerative colitis. Plaintiff's diagnoses were listed as complaints of abdominal pain, hypokalemia, nausea, vomiting, and diarrhea. (Tr. 1441). Plaintiff had a CT of her abdomen and Pelvis, which showed some scattered diverticula in the sigmoid colon, but was otherwise a negative exam. (Tr. 1477).

On March 3, 2018, Brian Hyatt, MD, diagnosed plaintiff with chronic dysthymia, major depressive disorder, severe cluster B personality disorder, somatization disorder, obesity, and hypertension.  (Tr. 1431).  Dr. Hyatt noted Plaintiff's claims of Crohn's disease, claims of diverticulitis and multiple other gastrointestinal diseases (describing as vague in nature); a dubious history of stroke; and possible Munchausen syndrome.  Plaintiff's mental status exam reflected her grooming and hygiene were "reasonable enough," unremarkable speech, depressed mood and affect, suicidal but not homicidal thoughts, and poor judgment and insight.

14

(Tr. 1430). Dr. Hyatt noted Plaintiff had a past psychiatric history significant for a litany of previous diagnoses, most of which were grossly erroneous, noting Plaintiff's report that she had been treated for bipolar which "she clearly does not have" (Tr. 1428). While Plaintiff had been treated for major depressive disorder, Dr. Hyatt opined it was more likely chronic dysthymia with periods of instability that were arguably major depressive disorder in nature, and her primary issue was a somatization disorder with symptoms ranging across multiple organ systems but typically involving the GI tract. He opined that Munchausen syndrome was certainly within the differential diagnosis, observing that the ER physician had reported Plaintiff was witnessed sticking her finger down her throat to induce vomiting and had numerous emergency room visits for vomiting. Dr. Hyatt opined that Plaintiff was largely misleading and at times, appeared to be lying. She did report a multitude of depressive symptoms including suicidal ideation with planning as well as intent. Dr. Hyatt opined Plaintiff had a severe cluster B personality disorder which, in conjunction with somatization, was her primary issue. Dr. Hyatt observed that Plaintiff had reported her psychiatrist was Dr. Watkins, who, in fact, is a family physician[6]. He noted Plaintiff's claim that she had Crohn's disease, diverticulitis, and a host of other GI diseases but observed that she had undergone multiple scopes, and nothing had ever been found to confirm Crohn's. He further noted Plaintiff's report of a stroke and left-sided weakness which is evident on exam. (Tr. 1429). Finally, he noted Plaintiff's list of medications was a "moving target", with, at best, dubious adherence. The ER reported she misused her drugs and Phenergan[7] was in the mix. During her stay and on March

---

[6] Dr. Watkins refers to Charla Watkins of Watkins Family Health & Counseling who is licensed as a DNP, FNP-BC, and SANE-A. (Tr. 1491).

[7] Phenergan (generic name promethazine) is an antihistamine that is also used to treat nausea and vomiting, and can also be used as a sedative before and after surgery or to help certain

3, 2018, Plaintiff was seen by Daniel Clark, Social Worker, MSW. (Tr. 1456). She presented bright, smiling, and abundantly happy, reporting that she was ready to go home and get on with her life and denying suicidal ideation.  Plaintiff's husband's gambling was discussed, and she expressed being overwhelmed by the idea he was gambling again and got very angry.  Plaintiff discussed not completing nursing school; taking care of her five grandchildren; and being stressed while her son lived with them and that he had recently moved out. Plaintiff's strengths were listed as being bright and aware, with stated good support and church involvement, while her weakness were poor coping skills and insight and being codependent. (Tr. 1457). Plaintiff attended group therapy throughout her stay in the behavioral health unit and was attentive and calm.  She often was noted to be withdrawn and depressed, but her engagement improved over her stay. (Tr. 1448–53, 1458–59).

On March 6, 2018, Plaintiff was discharged by Dr. Hyatt who gave the same opinions as offered on March 3, 2018.  (Tr. 1442–46).  Dr. Hyatt noted that Plaintiff lived in Rogers with her third husband, opining that her husband contributed to her difficulties; that Plaintiff had been jailed for forging a transcript related to nursing school, which was in line with her personality disorder; and that Plaintiff integrated reasonably well into the milieu during her hospitalization and attended group sessions on a regular basis.  Dr. Hyatt addressed the side effects, risk, benefits, and alternatives of her medications. With respect to Plaintiff's judgment and insight upon discharge, Dr. Hyatt note they were at baseline:  Plaintiff's mood was okay, and her affect was euthymic "giant smile" while her memory and attention span were within normal limits. Plaintiff was provided nicotine gum for tobacco cessation, and her diagnoses at

---

opioid pain relievers work better. *See* https://www.webmd.com/drugs/2/drug-6606/phenergan-oral/details  (Last accessed November 9, 2021).

discharge were chronic dysthymia, major depressive disorder, severe cluster B personality disorder, somatization disorder, possible Munchausen syndrome, (claims of) Crohn's disease, (claims of) diverticulitis and multiple other GI diseases, obesity, hypertension, and a dubious history of stroke.

On March 7, 2018, Plaintiff was seen by DNP Watkins for follow-up related to her depression and anxiety.  She reported her recently inpatient stay for psychiatric services, denying suicidal or homicidal ideation or any hallucinations. (Tr. 1492).  She reported to be working on good communication with her husband, and self-care. Plaintiff was noted to be well groomed with a sad affect but demonstrating good insight.

On March 27, 2018, Plaintiff was seen by DNP Watkins for another follow-up related to her anxiety and depression, wherein she denied any side effects of citalopram. (Tr. 1493). Plaintiff voiced concerns about two childhood incidents where she hit her head and wanted to make sure she was not affected by them, as she was having headaches 1-2 times per week. Plaintiff's diagnoses were anxiety, depression, and right otitis media (inflammation of middle ear). DNP Watkins requested an MRI of Plaintiff's brain to rule out migraine vs traumatic brain injury (TBI). Plaintiff was prescribed citalopram and cipro.

On March 31, 2018, Plaintiff was seen in the emergency department by David Ryals, MD, with lower left quadrant and periumbilical abdomen pain reported as occurring for the past six weeks, and multiple episodes of vomiting and diarrhea on this day. (Tr. 2006–2007). Plaintiff's basic lab work was grossly within normal limits, and she was given fluids and morphine intravenously. She was discharged home with pain and nausea medication with required PCP follow-up.

On April 6, 2018, Plaintiff was seen by Hunter Henry, MD, in the Emergency Department at Washington Regional Medical Center for left sided flank pain for the past two days as well as dysuria, blood in her urine, and one episode of vomiting. (Tr. 2016). Plaintiff reported she had taken pain medication at home with only mild improvement and reported her last kidney stone was two years prior and she had passed it at home. Plaintiff's physical exam was normal, but urinalysis showed trace hematuria without infection. Dr. Henry opined her bloodwork was normal and the CT scan showed no acute findings. Dr. Henry noted the etiology of Plaintiff's pain was unclear, but she had no acute or identifiable emergencies at this time and discharged her with instructions to follow-up with her PCP.

On April 30, 2018, Plaintiff was seen by Lauren McCaslin, MD, in the emergency department with diarrhea and vomiting, concerned that she may have C. diff from which she had suffered from multiple times in the past. (Tr. 1996–97). She reported having started ciprofloxacin[8] for an ear infection and after a five-day course, had failed to clear the infection, after which she was given a ten-day course of the same. Plaintiff reported having negative C. diff smears since having a fecal transplant last year, but believed she had C. diff. She reported recently having a swallow capsule endoscopy that showed inflammation, but no abscess or polyps so she did not feel this could be secondary to an ulcerative colitis problem. Plaintiff was given IV fluids, pain medicine and antiemetics. Her labs were negative for acute findings. She was unable to provide a stool sample and was instructed to follow-up with PCP with a

---

[8] Ciprofloxacin (brand name Cipro) belongs to a class of drugs called quinolone antibiotics and is used to treat a variety of bacterial infections. https://www.webmd.com/drugs/2/drug-7748/ciprofloxacin-oral/details  (Last accessed on November 10, 2021).

stool sample. It was noted Plaintiff was a chronic taker of narcotics and was not given any more.

On May 9, 2018, Plaintiff was seen by Elizabeth Sharp, MD, in the Emergency Department and reported vomiting for the past three to four days, now with blood. (Tr. 2355–57). She had just finished antibiotics for an ear infection and now was having diarrhea and abdominal pain. She was unable to keep her Dilaudid down. Plaintiff's labs were noted to be normal and negative for C. diff.  Stool samples were sent out for ova and parasite culture with plans to start antibiotics if the cultures were returned positive.

On May 16, 2018, Plaintiff was seen by Nurse Watkins for follow-up and medication management. She denied any side effects of citalopram and reported she was scheduled for an MRI of her brain the next day. (Tr. 2483). Diagnoses at this visit were anxiety and depression and Plaintiff was prescribed two Valium to take before her MRI.

On May 26, 2018, Plaintiff was seen by Kathryn Rhyne, PA, in the Emergency Department with abdominal pain for the past five days. (Tr. 2183–87). PA Rhyne noted Plaintiff had not been diagnosed with Crohn's, had multiple normal endoscopies and colonoscopies, had a history of similar symptoms and had been in and out of the ER multiple times. PA Rhyne also noted Plaintiff was recently seen by Dr. Hyatt and diagnosed with somatization and Munchhausen, typically with GI related complaints. Plaintiff was diagnosed with abdominal pain. PA Rhyne noted Plaintiff was not vomiting during her ED stay, had asked for Dilaudid[9] and was instead offered Tylenol and Phenergan, but declined Tylenol. Plaintiff

---

[9] Dilaudid (generic name hydromorphone) is an opioid analgesic. *See* https://www.webmd.com/drugs/2/drug-9130/dilaudid-oral/details  (Last accessed November 10, 2021).

wanted to go home and — given lack of blood in stool, normal CBC, and lack of signs of dehydration — PA Rhyne felt this was a chronic problem and planned to discharge her. Plaintiff had a CT of her abdomen and pelvis which showed: wall thickening of the transverse and left colon which may be due to under distension or mild colitis; fatty liver; non-obstructing left-sided nephrolithiasis without hydronephrosis or ureterolithiasis; and scattered colonic diverticula without diverticulitis. (Tr. 2353). Plaintiff had a stool culture tested on this date which showed no Shiga Toxin 1 or 2, no salmonella, shigella, campylobacter, or E. Coli but was positive for C. diff. (Tr. 2207, 2210).

On May 27, 2018, Plaintiff was seen by Sammy Turner, MD, in the ED with complaints of a Crohn's flareup and reported that pain and bloody stools prompted her visit. (Tr. 2345–53).  Dr. Turner reviewed her chart extensively and noted the multiple consults, evaluations, and colonoscopies which were inconclusive/did not show any evidence of inflammatory bowel disease on biopsy but found that Plaintiff did suffer with chronic colonic issues, was in chronic pain and took a host of high dose medications. Dr. Turner noted Plaintiff had complaints of pain and nausea and requested pain medications. Dr. Turner suspected this chronic pain and medication regimen played some role in her chronic pathology and discussed this at length with her.  Plaintiff's lab and CT were grossly normal, and she was advised to follow-up with her PCP.

On May 30, 2018, Plaintiff was seen by Dr. Porte to follow up on her positive C. diff test. She reported diarrhea every fifteen to twenty minutes with nausea, and vomiting. She could not keep anything down, felt her medications were not being absorbed, and reported fatigue and weight loss. (2214–18). Dr. Porte advised Plaintiff she could not be admitted to the hospital from his office and should keep her appointment with the GI specialist. Dr. Porte

informed Plaintiff she would have to get worse before they would admit her to the hospital, advised her to follow up as needed, and refilled her hydromorphone.

On June 2, 2018, Plaintiff was seen in the Washington Regional Medical Center Emergency Department by Robby Guinn, DO, and reported that she had been diagnosed with C. diff on Sunday and continued to have diarrhea and pass undigested vancomycin capsules. (Tr. 2390–91). Plaintiff saw Dr. Moore the day before who told her he would have the vancomycin compounded to liquid form, but she had not yet been notified that her medication was ready. Plaintiff's potassium was slightly low, but electrolytes were otherwise normal. She did not have an acute abdomen on physical examination and had produced one diarrhea stool. She was tolerating drinking liquids without vomiting while in the emergency department. Dr. Ellison, the gastroenterologist on call, agreed to call in the liquid vancomycin prescription. Plaintiff's pain was under control, and she was discharged home.

On June 7, 2018, Plaintiff was seen in the Emergency Department at Washington Regional Medical Center to recheck for C. diff and dehydration and was seen by Richard Tutt, MD. (Tr. 2337–38).  She had generalized diarrhea that had been going on for a week or so. Plaintiff was assessed with diarrhea and abdominal pain.

Plaintiff was hospitalized from June 9, 2018, through June 11, 2018, due to a C. diff diagnosis that was not improving. (Tr. 2375–83).  A physical examination revealed diffuse mild tenderness to palpation in her abdomen with diffuse mild distension, no peritoneal signs, and positive bowel sounds. An extensive history was written by Dr. Kevin O'Keefe:  Plaintiff was a patient of Dr. Moore's with a history of recurrent C. diff infection in 2017, as well as IBS with diarrhea who was admitted yesterday with severe diarrhea which was believed to be

secondary to a C. diff infection reoccurrence. Plaintiff had been recently seen at the Washington Country Regional Medical Center but was unhappy with her care and went to the Northwest Medical Center where she was diagnosed with a C. diff infection. She reported undergoing several rounds of treatment for C. diff in 2017 including a prolonged vancomycin taper but ultimately had to undergo a fecal transplant in April of 2017. Plaintiff reported this successfully treated her C. diff. Then one month ago, she took Cipro for a severe ear infection, but after completing the course of antibiotics, developed severe diarrhea after which she was prescribed vancomycin. She was seeing the pills in her stool, undigested, and went to the Manic Gastroenterology clinic approximately ten days prior and the plan was for her to begin liquid vancomycin, but it appeared this prescription was never filled. Plaintiff was admitted at the ED on June 9 for further evaluation, and the CT scan "interestingly" showed mild colonic constipation despite Plaintiff's report that she was having liquid diarrhea every fifteen minutes at home. Since being admitted for the past 24r hours, Plaintiff had been given oral vancomycin and IV Flagyl and reported her diarrhea was improved but not resolved. She had complaints of severe abdominal pain and asked for Dilaudid, as the morphine she was currently on was not completely addressing her pain symptoms. A review of their office notes revealed Plaintiff was supposedly recently diagnosed with somatization disorder and possible Munchausen disorder and Dr. O'Keefe requested further evaluation. (Tr. 2381–83). Dr. O'Keefe noted Plaintiff's clinical picture was somewhat mottled as Plaintiff's CT showed constipation and her electrolytes were normal, but she reported diarrhea every fifteen minutes prior to admission. He planned to repeat her C. diff assay to ensure she had not been misdiagnosed outside the hospital. He explained to Plaintiff that he was reluctant to add Dilaudid to her pain regimen, as reducing the motility of her GI tract would be dangerous if she had C. diff, but he

would increase her morphine frequency and see if this helped her. If she had recurrent C. diff, he planned to start her on fidaxomicin[10] as she had not ever taken this and had failed vancomycin in the past. He also restarted her at home antihypertensive and added the trazadone she requested at bedtime.

On June 11, 2018, Dr. O'Keefe wrote a discharge summary for Plaintiff after her discharge by Dr. Jeffrey Ellison, who had provided no documentation regarding her status or reason for discharge but had arranged for outpatient antibiotic therapy for Plaintiff. (Tr. 2384).

On July 9, 2018, Plaintiff was seen at Washington Regional Medical Center for evaluation of nephrolithiasis (kidney stones) with complaints of intermittent left flank pain. Plaintiff reported she had recently been prescribed Topamax for "brain lesions" and was aware Topamax could increase kidney stone formation. (Tr. 2595–99). She complained of intermittent bladder spasms, hesitancy, and trouble emptying her bladder but reported the Levsin she was prescribed for colon spasms aided her bladder spasms.

On August 14, 2018, Plaintiff was seen by Dr. Rogers for a hospital follow up. (Tr. 2687–90). She reported flank pain and a Crohn's flare up. A CT had been performed; she was prescribed Flagyl; she saw her urologist, Dr. McWhorter; and had an appointment next week with Dr. Moore to discuss another fecal implant. Plaintiff was assessed with recurrent kidney stones, abdominal pain, and Crohn's disease, with other complication. Dr. Rogers agreed with

---

[10] Fidaxomicin (brand name Dificid) is used to treat Clostridium difficile-associated diarrhea. Fidaxomicin is known as a macrolide antibiotic. It works by stopping the growth of this resistant bacteria. This antibiotic works in the intestines and is not absorbed by the body. *See* https://www.webmd.com/drugs/2/drug-156020/fidaxomicin-oral/details (Last accessed on November 10, 2021).

Dr. Moore about avoiding hydromorphone (as it can cause gastroparesis), and continuing Tramadol as needed for pain.

On January 20, 2019, Plaintiff called Ladonna Hayner, RN, of Mercy Home Health and was upset because she had vomiting and diarrhea with weakness and dizziness. (Tr. 2542–43). Her blood pressure was 144/97 but was emotionally upset as her husband was not home; she had two grandkids under the age of four at home with her; and she had not taken her meds. Plaintiff was advised to drink up to a liter of water, avoid salt, take her medication, and lay down and rest. Plaintiff reported her husband had just arrived home. Nurse Hayner followed up with Plaintiff two hours later, at which point Plaintiff's blood pressure was 138/78 and she was feeling a bit better.

On March 28, 2019, Plaintiff was seen by DNP Watkins for anxiety and depression. (Tr. 2802). Plaintiff appeared well groomed with clear speech and a steady gait. She discussed stress and anxiety regarding her husband's son and his girlfriend living with them, along with a report that they often drank and brought alcohol into their home. Plaintiff stated she and her husband took on the responsibility for watching their two grandchildren as the parents were often away or out drinking. Plaintiff was advised to practice setting boundaries and make time for her and her husband to talk and have a plan they could stick to, as well as having a date night once per week.

On April 9, 2019, Plaintiff was seen by PA Rhyne in the Northwest Medical Center Emergency Room. (Tr. 2739–46). Plaintiff had complaints of acute/chronic nausea, vomiting and diarrhea for five days with grossly bloody stools and a history of C. diff as well as a history of hypokalemia. Plaintiff vomited when taking promethazine and potassium at home.

24

Plaintiff's differential diagnoses were listed as abdominal pain, gastroenteritis, diverticulitis, diarrhea, and malingering. PA Rhyne noted plaintiff was tolerating treatment orally; her labs were grossly unremarkable other than the known mild hypokalemia; fecal occult blood test was negative; recent multiple CTs were normal; and Plaintiff exhibited malingering traits and manipulative behavior. PA Rhyne planned to treat Plaintiff symptomatically and have her follow up with her PCP.  Strong return to Emergency Department warning were given and she was advised to return if symptoms worsened within one to two days.

On April 19, 2019, Plaintiff was seen by DNP Watkins for follow-up on anxiety, depression, hypertension, and migraine headaches. (Tr. 2800). She also needed to complete her Mental Residual Functional Assessment for her disability hearing. Plaintiff had a flat affect 70% of the time but made regular eye contact and smiled 30% of the time. She had clear speech and a steady gait. Plaintiff denied any migraine headaches for the past two weeks. She reported her stress level as 8/10 due to her husband's adult children living with them and drinking alcohol in their home.  She was also concerned because her husband had to pawn her wedding ring until he got paid and she felt overwhelmed. Plaintiff was prescribed metoprolol, zonisamide, and a four-pronged walking cane to assist with ambulation and balance. (Tr. 2738, 2801).

On May 16, 2019, Plaintiff saw DNP Watkins for follow-up on major depression, anxiety, hypertension, and migraine headaches. (Tr. 2799). Plaintiff reported increased stress and anxiety due to her husband's adult children living with them, and how she had to set strong boundaries. Plaintiff reported her anxiety level was at 7/10 due to her husband's adult children living with them and drinking alcohol in their home. Plaintiff's blood pressure had improved over the last month, and she denied any migraine headaches in the last month. Plaintiff was

given a prescription for Valium to take as needed for anxiety and was cautioned her Valium prescription must last a full month. She was asked to exercise for half an hour three times a week to help decrease her anxiety, and follow up in one month for therapy.

On June 6, 2019, Plaintiff was seen by DNP Watkins for follow up on major depression, anxiety, hypertension, and migraine headache. (Tr. 2798). Plaintiff reported going to the emergency room the Friday prior for symptoms of a heart attack, but they determined she was okay. Plaintiff reported a planned knee surgery on June 18, 2019. Plaintiff reported no migraines for the past three weeks, her weight was up two pounds, and her systolic blood pressure had improved over the past month. DNP Watkins noted Plaintiff had a flat affect 65% of the visit versus 30% of her last appointment but she did make regular eye contact and smile during the assessment the majority of the time, save and except when processing feelings about her husband lying to her. She had clear speech and a steady gait. Plaintiff was prescribed Valium to take as needed for anxiety and insomnia, and was to follow up in one month.

### III.    Applicable Law:

This court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Miller v. Colvin*, 784

26

F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. *See* 20 C.F.R. § 404.1520(a)(4). The fact finder only considers Plaintiff's age, education, and work experience considering his or her residual functional capacity if the final stage of the analysis is reached. 20 C.F.R. § 404.1520(a)(4)(v).

## IV.    Discussion

Plaintiff raises the following issues in this matter: 1) whether the ALJ erred in denying Plaintiff's petition for physical and mental consultative examinations, thus failing to fully and fairly develop the record; 2) Whether the ALJ erred in her treatment of the opinion evidence in her RFC findings; and 3) whether the ALJ erred by omitting medically determinable impairments from her step two analysis. (ECF No. 18).  Defendant argues Plaintiff waived her step two argument as she provided no argument or analysis of the law in relation to her facts. (ECF No. 19, p. 2).

The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure his decision is an informed decision based on sufficient facts.  *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). However, the ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record. *Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014) (quoting *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994). While "[a]n ALJ should recontact a treating or consulting physician if a critical issue is undeveloped," "the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted).

Of concern to the undersigned is the ALJ's treatment of Plaintiff's mental impairments. Plaintiff was diagnosed with a somatization disorder, possible Munchausen syndrome, and a severe cluster B personality disorder. Each of these impairments were found to be severe by the ALJ, although not severe enough to meet or medically equal the listings. (Tr. 20–21). Somatization and Munchausen's disorder are often used interchangeably, and sometimes are

28

even used to describe malingering, but they are distinct disorders and the distinction between the three is important in assessing Plaintiff's subjective complaints, severity of impairments, and ultimately the issue of whether she is disabled.[11] Malingering is the intentional feigning of symptoms, either physical or psychological, which is motivated by external factors such as time off of work, drug seeking, etc. Munchausen's is an outdated term for what are now called factitious disorders,[12] which involve the falsification of physical or psychologic symptoms and/or signs in the absence of obvious external incentives (e.g., obtaining time off from work, disability payments, or drugs of abuse, avoiding military service, or criminal prosecution).[13] Somatic Symptom Disorder, in contrast, involves no element of facetiousness — the symptoms are not under voluntary control and the person affected is authentically

---

[11] "It is important to recognize that the difference between malingering, a conversion disorder and a factitious disorder is the goal or the intent of the patient. Malingering patients desire secondary gain such as workman's compensation, damages through liability suits or a furlough from jail. Patients with a conversion disorder do believe that their illness is 'real.' There is no gain. Factitious disorders manifest typically as a Munchausen syndrome with the desire to play the role of a patient. The primary gain is the acquisition of sympathy and emotional support." Ahmed K. Pasha and Manish Sharma, *Malingering, conversion and factitious disorders. The emotional and monetary costs to the healthcare delivery system,*

JOURNAL OF COMMUNITY HOSPITAL INTERNAL MEDICINE PERSPECTIVES, published online on September 5, 2019, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6735308/.

[13] Joel E. Dimsdale, *Overview of Somatization,* MERK MANUAL, Last modified October 2020, available at https://www.merckmanuals.com/professional/psychiatric-disorders/somatic-symptom-and-related-disorders/overview-of-somatization

suffering[14]— and has proved a source of difficulty in numerous disability cases over the years.[15]

In assessing Plaintiff's subjective complaints, the ALJ found Plaintiff's limitations were not entirely supported by the medical evidence of record. The ALJ considered Plaintiff's use of a cane which was prescribed by DNP Watkins, but noted Plaintiff's gait was described as steady at the appointment she was prescribed said cane. (Tr. 24).  The ALJ also found Plaintiff was able to provide extensive care for her grandchildren. Both findings ignore important evidence in the medical record, including Plaintiff's numerous complaints about the stress of having her grandchildren left for her to watch by their parents, and Plaintiff's home health visits specifically for improving her balance. Beyond these two factors, the ALJ explained her subjective complaints were inconsistent with the objective medical evidence and cited medical records noting a history of malingering, diagnosis of Munchausen's, and grossly normal CT's.

There are medical records indicating Plaintiff's reports do not align with the objective evidence, such as Dr. O'Keefe's observation in June of 2018 that despite Plaintiff's report of diarrhea every fifteen minutes prior to admission, Plaintiff's CT showed mild constipation and her electrolytes were normal. (Tr. 2381).  Dr. O'Keefe also noted that, upon review of office notes, it appeared Plaintiff was recently diagnosed with a somatization disorder and possible

---

[14] DSM – 5 Somatic symptom disorder. "The individual's suffering is authentic, whether or not it is medically explained."
https://dsm.psychiatryonline.org/doi/full/10.1176/appi.books.9780890425596.dsm09

[15] "Subjective perceptions of somatoform effects may, in fact, be debilitating even when clinical or diagnostic medical evidence does not fully support the claimed symptoms." *Nowling v. Colvin,* 813 F.3d 1110, 1114–15 (8th Cir. 2016).

Munchausen's and Dr. O'Keefe requested further evaluation. It is not apparent from the medical evidence of record whether Plaintiff was more thoroughly evaluated or treated for either Munchausen's or a somatization disorder following Dr. O'Keefe's request. Interestingly, DNP Watkins – a psychiatric nurse who provided Plaintiff with the bulk of her mental health treatment – did not note symptoms of malingering or provide a diagnosis of either a somatoform or factitious disorder.

Worryingly, Plaintiff was hospitalized more than once during the relevant period and only some of these stays were even mentioned by the ALJ. Plaintiff was hospitalized from December 1, 2017, through December 3, 2017, after presenting to the emergency department with a 6-day history of nausea, vomiting, diarrhea, and cramping abdominal pain which had progressed to vomiting blood. (Tr. 1976-95). The ALJ discussed Plaintiff's psychiatric hospitalization from March 2, 2018, through March 6, 2018, and her psychiatric evaluation by Dr. Brian Hyatt on March 3, 2018, who opined her primary issue was somatization and a personality disorder, and that Munchausen syndrome was within the differential. (Tr. 21, 1428-31). Plaintiff was hospitalized between June 9, 2018, and June 11, 2018, after receiving a C. diff diagnosis two weeks prior because she was not improving despite taking vancomycin and had a history of recurrent C. diff infections in 2017. (Tr. 2375-2385). The ALJ did consider Plaintiff's hospitalization from June 22, 2018, through June 24, 2018, for abdominal pain with a history of C. diff. although her workup had been negative. (Tr. 22, 2326-2332). At discharge, Plaintiff's diagnoses were acute diarrhea with nausea, vomiting, and abdominal pain, periumbilical region, likely secondary to irritable bowel syndrome; anxiety and depression; and benign essential hypertension. In discharge notes, Eric P. Goodspeed, DO, noted Plaintiff had a history of TBI, depression, and anxiety that contributed to her overall health complexity.

31

Based on the medical evidence of record, the question has not yet been resolved as to whether Plaintiff is suffering from a somatization disorder, Munchausen disorder, or is simply a malingerer. As discussed above, this cannot be considered harmless error not only because it impacts the step two analysis, but also because it affects the analysis of Plaintiff's subjective complaints.

The ALJ found that Plaintiff suffered from two mental disorders that cannot be co-occurring and one of which, specifically Munchausen disorder, was not actually diagnosed. The ALJ then used symptoms of these disorders — reporting symptoms or pain that is not supported by objective evidence — as the primary reasoning to discredit Plaintiff's subjective complaints. The ALJ did not make an explicit finding or provide her reasoning for denying Plaintiff's request for a mental consultative examination. The Court finds the ALJ erred in failing to fully and fairly develop the record concerning Plaintiff's mental impairments, making it impossible for the ALJ to adequately consider the severity of Plaintiff's combination of impairments and their effect on her RFC.

On remand, the ALJ is directed to procure further evidence regarding Plaintiff's mental impairments. The ALJ should direct interrogatories to Plaintiff's mental healthcare provider, DNP Watkins, and shall also procure a medical opinion from a qualified expert regarding Plaintiff's mental impairments and their effect on her RFC. The ALJ is further directed to address interrogatories to a qualified mental health expert requesting that said physician review all of Plaintiff's medical records; complete an RFC assessment regarding Plaintiff's capabilities during the period in question; and provide the objective basis for the assessment so that an informed decision can be made regarding Plaintiff's ability to perform basic work activities on a sustained basis. The ALJ may also order a consultative examination, in which,

the consultative examiner should be asked to review the medical evidence of record, perform examinations and appropriate testing needed to properly diagnose Plaintiff's condition(s), and complete a medical assessment of Plaintiff's abilities to perform work related activities. *See* 20 C.F.R. § 416.917. With this evidence, the ALJ should then re-evaluate Plaintiff's RFC and specifically list in a hypothetical to a vocational expert any limitations that are indicated in the RFC assessments and supported by the evidence.

## V.    Conclusion

Accordingly, the Court concludes that the ALJ's decision is not supported by substantial evidence. Based on the forgoing, it is recommended that the Commissioner's final decision be reversed, and the case remanded back to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 18th day of December 2021.

*Christy Comstock*
CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE